RECEIVED

SEP 09 2020

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT, LOUISIANA
BY_____

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| UNITED STATES OF AMERICA | * | |
|---|---|---|
| | * | 3:20-cr-00196-01 |
| VS. | * | Judge Doughty |
| | * | Magistrate Judge Hayes |
| GEORGE M. "TREY" **FLUITT**, III | * | |

## INDICTMENT

THE GRAND JURY CHARGES:

### COUNT 1
### Conspiracy to Defraud the United States
### and to Pay and Receive Health Care Kickbacks
### [18 U.S.C. § 371]

## I.  BACKGROUND

### The Medicare Program

1.    The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled.  The benefits available under Medicare were governed by federal statutes and regulations.  The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare.  Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

2.      Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

3.      Medicare "Part B" was a medical insurance program that covered, among other things, medical services provided by physicians, medical clinics, laboratories, and other qualified health care providers, such as office visits, minor surgical procedures, and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

4.      Physicians, clinics, and other health care providers, including laboratories (collectively, "providers"), that provided services to beneficiaries were able to apply for and obtain a "provider number."  Providers that received a Medicare provider number were able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

5.      When seeking reimbursement from Medicare for provided benefits, services, or items, providers submitted the cost of the benefit, service, or item provided together with a description and the appropriate "procedure code," as set forth in the Current Procedural Terminology ("CPT") Manual or the Healthcare Common Procedure Coding System ("HCPCS").  Additionally, claims submitted to Medicare seeking reimbursement were required to include: (a) the beneficiary's name and Health Insurance Claim Number ("HICN"); (b) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (c) the name of the provider, as well as the provider's unique identifying number, known either as the

Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI"). Claims seeking reimbursement from Medicare were able to be submitted in hard copy or electronically.

6.     Medicare, in receiving and adjudicating claims, acted through fiscal intermediaries called Medicare administrative contractors ("MACs"), which were statutory agents of CMS for Medicare Part B. The MACs were private entities that reviewed claims and made payments to providers for services rendered to beneficiaries. The MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service.

7.     To receive Medicare reimbursement, providers needed to have applied to the MAC and executed a written provider agreement. The Medicare provider enrollment application, CMS Form 855B, was required to be signed by an authorized representative of the provider. CMS Form 855B contained a certification that stated:

> I agree to abide by the Medicare laws, regulations, and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

8.     In executing CMS Form 855B, providers further certified that they "w[ould] not knowingly present or cause to be presented a false or fraudulent claim

for payment by Medicare and w[ould] not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

### Genetic Testing

9.      Cancer genetic tests ("CGx" tests) were laboratory tests that used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future.  Pharmacogenetic tests ("PGx" tests) were laboratory tests that used DNA sequencing to assess how the body's genetic makeup would affect the response to certain medications.  CGx and PGx tests were referred to collectively as "genetic testing."  Neither type of genetic testing was a method of diagnosing whether an individual had a disease, such as cancer, at the time of the test.

10.      To conduct genetic testing, a laboratory had to obtain a DNA sample from the patient.  Such samples were typically obtained from the patient's saliva by using a cheek (buccal) swab to collect sufficient cells to provide a genetic profile.  The genetic sample was then submitted to the laboratory to conduct the test.

11.      DNA samples were submitted along with requisitions that identified the patient, the patient's insurance, and indicated the specific type of tests to be performed.  In order for laboratories to submit claims to Medicare for genetic tests, the requisitions had to be signed by a physician or other authorized medical professional, who attested to the medical necessity of the test.  Requisitions with a provider's signature were known as "physicians' orders."

## Telemedicine

12.   Telemedicine provided a means of connecting patients to doctors and other medical professionals by using telecommunications technology, such as the internet or telephone.   Medicare deemed telemedicine an appropriate means to provide certain health care related services ("telehealth services") to beneficiaries, including, among other services, consultations and office visits, when certain requirements were met during the relevant time period.

13.   Telemedicine companies typically provided remote communications technology for doctors and other providers to conduct consultations with patients for non-emergency medical conditions and determine the medically necessary treatment options, if any.

## The Defendant and Relevant Entities

14.   Specialty Drug Testing LLC ("Specialty") was a Louisiana limited liability company with its principal place of business in Monroe, Louisiana, within the Western District of Louisiana.   Specialty applied for and was enrolled as a Medicare provider.   Specialty was a laboratory that provided and billed Medicare for diagnostic laboratory services, including toxicology, blood, and genetic testing.

15.   Defendant **George M. "Trey" Fluitt, III**, a resident of Sterlington, Louisiana, was the co-owner of Specialty.   **Fluitt** signed the CMS Form 855B, as well as additional documents submitted to Medicare, on behalf of Specialty.

16.   Company-1 was a South Carolina limited liability company that purported to provide "marketing services" to laboratories by providing them, in

exchange for payments, with DNA samples and accompanying physicians' orders that the laboratories could use to submit claims to Medicare for genetic testing.

17.    Co-conspirator-1 owned, operated, and/or controlled Company-1.

18.    Company-2 was a purported marketing company that, among other things, obtained DNA samples and physicians' orders for the purpose of selling them to laboratories that could bill Medicare for genetic testing.

19.    Company-3 was a purported marketing and medical billing company. Company-2 and Company-3 arranged for telemedicine providers to sign off on physicians' orders for CGx and PGx tests that Company-1 and Company-2 referred to laboratories.

20.    Co-conspirator-2, a resident of Florida, co-owned and operated Company-2 and Company-3.

## II.    THE CONSPIRACY

21.    Beginning in or around June 2018, and continuing through in or around August 2019, in the Western District of Louisiana, and elsewhere, the defendant,

### George M. "Trey" Fluitt, III,

did willfully, that is with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with Co-conspirator-1, Co-conspirator-2, and others known and unknown to the Grand Jury, to commit certain offenses against the United States, that is:

a.    to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of

6

the HHS in its administration and oversight of Medicare, in violation of Title 18, United States Code, Section 371;

      b.     to violate Title 42, United States Code, Section 1320a-7b(b)(1)(B), by soliciting and receiving any remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by check and wire transfer, in return for purchasing, leasing, ordering, and arranging for and recommending purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole and in part by a Federal health care program; and

      c.     to violate Title 42, United States Code, Section 1320a-7b(b)(2)(B), by offering to pay, and offering and paying, any remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by check and wire transfer, in return for purchasing, leasing, ordering, and arranging for and recommending purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole and in part under a Federal health care program.

## Purpose of the Conspiracy

22.    It was a purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves and others by:

      (a) soliciting, receiving, offering, and paying kickbacks and bribes in return for patient DNA specimens and physicians' orders for CGx and PGx testing;

(b) submitting and causing the submission of false and fraudulent claims to Medicare for CGx and PGx testing services that were procured through kickbacks and bribes, were not medically necessary, and were not eligible for reimbursement;

(c) concealing the submission of false and fraudulent claims to Medicare, and the receipt and transfer of the proceeds of the fraud; and

(d) diverting proceeds of the fraud for the personal use and benefit of the defendant and his co-conspirators.

### Manner and Means of the Conspiracy

23.    The manner and means by which the defendant and his co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things, the following:

a.    **Fluitt** falsely certified to Medicare, through a Medicare provider application submitted to a MAC, that he, as well as Specialty, would comply with all Medicare rules and regulations, and federal laws, including that they would not knowingly present or cause to be presented a false and fraudulent claim for payment by Medicare, and that they would comply with the Anti-Kickback Statute.

b.    Co-conspirator 1, Co-conspirator 2, and others known and unknown to the Grand Jury, targeted and recruited beneficiaries through telemarketing campaigns, appearances at health fairs, and other forms of aggressive solicitation to induce them to submit DNA samples for CGx and PGx testing.

      c.        **Fluitt**, through Specialty, offered to pay, and paid, kickbacks and bribes to Co-conspirator-1 and Co-conspirator-2, through Company-1, Company-2, and Company-3, in exchange for the ordering and arranging for the ordering of CGx and PGx testing for beneficiaries by Specialty, knowing that Specialty would bill Medicare for tests purportedly provided to the recruited beneficiaries.

      d.        Co-conspirator-1 and Co-conspirator-2 solicited and received kickbacks from **Fluitt**, through Company-1, Company-2, and Company-3, in exchange for DNA specimens and physicians' orders for CGx and PGx testing, knowing that Specialty would bill Medicare for tests purportedly provided to the recruited beneficiaries.

      e.        **Fluitt** and Co-conspirator 1 entered into a written contract setting forth an agreement to pay and receive kickbacks in exchange for DNA specimens and physicians' orders for CGx and PGx testing.

      f.        **Fluitt** and his co-conspirators agreed to pay a portion of the kickback and bribe payments from Specialty as kickbacks and bribes to telemedicine providers, in exchange for signed physicians' orders for CGx and PGx testing.

      g.        **Fluitt** caused kickback and bribe payments to be transmitted to Co-conspirator 1 and Co-conspirator-2, by check and wire, from a bank account held in the name of Specialty at Marion State Bank, to bank accounts held in the name of Company-1 and Company-3.

      h.        **Fluitt**, Co-conspirator 1, and Co-conspirator-2 tracked the genetic tests performed on behalf of the beneficiaries referred by them, in addition to

the reimbursements Specialty received from Medicare and the amounts of the kickback and bribe payments.

      i.      **Fluitt**, Co-conspirator 1, and Co-conspirator 2 created and transmitted invoices and spreadsheets reflecting the kickback and bribe payments owed by Specialty, and used email and other forms of communication to inform each other of Medicare reimbursements, the payment of kickbacks and bribes, and other matters related to the scheme.

      j.      **Fluitt**, Co-conspirator 1, Co-conspirator 2, and others caused Specialty to submit false and fraudulent claims by interstate wire to Medicare in at least the approximate amount of $117,158,553 for CGx and PGx testing that was procured through the payment of kickbacks and bribes, medically unnecessary, and ineligible for reimbursement.  As a result of these false and fraudulent claims, Medicare paid Specialty at least the approximate amount of $28,726,229.

      k.      **Fluitt** and his co-conspirators used the proceeds received from Medicare to benefit themselves and others, and to further the scheme.

### Overt Acts

24.      In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one co-conspirator committed and caused to be committed, in the Western District of Louisiana, and elsewhere, at least the following overt acts, among others:

      a.      On or about June 5, 2018, in response to an email forwarding a draft contract, Co-conspirator 1 sent an email to **Fluitt** and others stating, "Can we

have a brief call today to discuss the contract?  Just wanted to make sure we were all on the same page and in agreement."

     b.    On or about June 5, 2018, **Fluitt** sent an email to Co-conspirator 1 stating, "[    ] and I can talk at any time just give me a little notice.  Trey."

     c.    **Fluitt** and Co-conspirator 1 entered into an agreement on or about June 1, 2018 whereby Specialty would pay kickbacks and bribes according to the following formula: (i) calculating the Medicare reimbursement for each beneficiary referred by Co-conspirator 1 and Co-conspirator 2; (ii) deducting the cost of goods that the laboratory incurred in conducting the tests, typically by paying a reference lab to run the test; (iii) paying a billing fee of 5%; (iv) paying a $1,000 kickback to be passed through Company-1, Company-2, and Company-3 to compensate marketers, known as "sales reps," who procured the DNA samples; and (v) paying approximately 50% of the remainder as a "commission" to Co-conspirator 1 and Co-conspirator 2 through companies they controlled.

     d.    On or about July 20, 2018, Co-conspirator 2 emailed Co-conspirator 1 an invoice prepared by Company-3 addressed to Specialty, along with a spreadsheet identifying (i) beneficiaries for which genetic testing had been billed to Medicare, (ii) reimbursement amounts for each beneficiary, and (iii) amounts Specialty owed for marketers and commission.

     e.    On or about July 24, 2018, **Fluitt** caused a payment to be made by check in the approximate amount of $83,137.39 from Specialty's account at Marion State Bank to an account held in the name of Company-3 at JPMorgan Chase.

11

f.      On or about August 2, 2018, Co-conspirator 2 emailed Co-conspirator 1 an invoice prepared by Company-3 addressed to Specialty, along with a spreadsheet identifying (i) beneficiaries for which genetic testing had been billed to Medicare, (ii) reimbursement amounts for each beneficiary, and (iii) amounts Specialty owed for marketers and commission.

g.      On or about August 9, 2018, **Fluitt** caused a wire transfer in the approximate amount of $130,806.25 to be made from Specialty's account at Marion State Bank to a bank account held in the name of Company-3 at JPMorgan Chase.

h.      On or about February 5, 2019, **Fluitt** signed a debit memo from Specialty's bank account at Marion State Bank in the approximate amount of $618,080.27, which amount had been set forth on a commission report provided by a Specialty employee to **Fluitt** and Co-Conspirator 1 identifying (i) beneficiaries for which genetic testing had been billed to Medicare, (ii) reimbursement amounts for each beneficiary, and (iii) amounts Specialty owed for marketers and commission.

i.      On or about February 5, 2019, **Fluitt** caused a wire transfer in the approximate amount of $618,065.27 to be made from Specialty's account at Marion State Bank to an account held in the name of Company-1 at Grand South Bank.

All in violation of Title 18, United States Code, Section 371.

<u>COUNTS 2-3</u>
**Offer and Payment of Kickbacks and Bribes in Connection
with a Federal Health Care Program
[42 U.S.C. § 1320a-7b(b)(2)(B)]**

25.    Paragraphs 1 through 24 of the Indictment are re-alleged and incorporated by reference as through fully set forth herein.

26.    On or about the dates set forth below, with respect to each count, in the Western District of Louisiana, and elsewhere, the defendant,

**George M. "Trey" Fluitt, III,**

did knowingly and willfully offer and pay remuneration, that is, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by check and wire transfer, in return for purchasing, leasing, ordering, and arranging for and recommending purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole and in part under a Federal health care program, as set forth below:

| COUNT | Approximate Date of Payment | Approximate Amount | Description |
|---|---|---|---|
| 2 | 7/24/18 | $83,137.79 | Check paid from Specialty's account at Marion State Bank to Company-3's account at JPMorgan Chase |
| 3 | 8/9/18 | $130,806.21 | Wire transfer from Specialty's account at Marion State Bank to Company-3's account at JPMorgan Chase |

Each of the above is a violation of Title 42, United States Code, Section 1320a-7b(b)(2)(B) and Title 18, United States Code, Section 2.

## NOTICE OF FORFEITURE

27.     Paragraphs 1 through 26 of the Indictment are re-alleged and incorporated by reference as through fully set forth herein for the purposes of alleging forfeiture to the United States.

28.     Upon conviction of the offenses alleged in Counts 1 through 3, the defendant, **George M. "Trey" Fluitt, III**, shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a)(7), all property, real and personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of said offenses, including but not limited to:

      a.     Gross proceeds of the offenses held in Marion State Bank Account Number xx0397 in the name of Specialty Drug Testing.

      b.     Gross proceeds of the offenses held in Marion State Bank Account Number xx4769 in the name of Company A.

      c.     Gross proceeds of the offenses held in Marion State Bank Account Number xx6787 in the name of Company B.

      d.     Gross proceeds of the offenses held in Guaranty Bank & Trust Bank Account Number xx8114 in the name of Company C.

      e.     Gross proceeds of the offenses held in Marion State Bank Account Number xx0813 in the name of Company D.

29.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

      a.     cannot be located upon the exercise of due diligence;

b.      has been transferred or sold to, or deposited with, a third party;

c.      has been placed beyond the jurisdiction of the Court;

d.      has been substantially diminished in value; or

e.      has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

A TRUE BILL:

## *REDACTED*

GRAND JURY FOREPERSON

ALEXANDER C. VAN HOOK
ACTING UNITED STATES ATTORNEY


SETH D. REEG
ASSISTANT UNITED STATES ATTORNEY

DANIEL KAHN
ACTING CHIEF
CRIMINAL DIVISION, FRAUD SECTION

GARY A. WINTERS
JUSTIN M. WOODARD
TRIAL ATTORNEYS
CRIMINAL DIVISION, FRAUD SECTION
UNITED STATES DEPARTMENT OF JUSTICE